Submitted on record and briefs November 20, 1987, affirmed May 18, 1988

MAGNUSON et ux,
*Respondents,*

*v.*

ZARKOFF et ux,
*Appellants,*

*v.*

RIFE et ux,
*Defendants,*

*and*

RIFE et ux,
*Cross-Claimants,*

*v.*

ZARKOFF et ux,
*Cross-Defendants.*

(86-C-10360; CA A42203)

754 P2d 910

J. Michael Alexander and Burt, Swanson, Lathen, Alexander & McCann, Salem, filed the brief for appellants.

Robert L. Engle and Eichsteadt, Bolland, Engle & Schmidtman, Woodburn, filed the brief for respondents.

Before Warden, Presiding Judge, and Joseph, Chief Judge,* and Van Hoomissen, Judge.

WARDEN, P. J.

---

* Joseph, C. J., *vice* Young, J., deceased.

## WARDEN, P. J.

Zarkoffs (defendants) appeal from a judgment granting plaintiffs specific performance of a provision in a land sale contract whereby defendants agreed to assign their lessee's interest in land adjacent to plaintiffs'. We affirm.

In October, 1982, the parties entered into an earnest money agreement for plaintiffs to purchase 14 acres of defendants' farm property. The sale was conditioned on defendants' leasing an adjoining 38-acre parcel owned by Rifes and transferring the leasehold interest to plaintiffs along with the 14 acres. In December, 1982, Mr. Zarkoff obtained a three-year lease of the Rifes' 38 acres. The lease contained an option to renew for three more years and an anti-assignment clause, providing:

> "This lease is entered into in part because of the mutual respect and trust the parties have with each other. [Defendants] shall not, without [Rifes'] written consent, assign, sublet, or permit any other person or persons to occupy or use the premises."

Plaintiffs were aware of the clause. Defendants' realtor consulted an attorney to see if a way could be found to avoid it. The attorney suggested that the following language be incorporated into the parties' formal sales agreement:

> "Buyers assume and agree to comply with all the conditions and obligations of the certain Farm Lease dated December 13, 1982, wherein Sellers are Tenants and Richard N. and Elaine M. Rife [are] Landlords. Buyers further agree to assume and pay to Sellers the cash-rent sums set forth in said lease agreement. Sellers, in turn, shall pay said sums to Landlords and shall hold buyers harmless from further liability therefor.
>
> "Sellers further agree that buyers shall have the exclusive use and right to farm said leased premises and to plant, cultivate and harvest crops thereon without any claim of lien, right, title or interest by sellers.
>
> "Sellers further agree that any and all purchase options given or granted by Landlords during the term of lease or upon expiration thereof shall automatically inure to the buyers and that they shall have thirty (30) days to exercise the same."

The attorney also suggested that Zarkoff farm eight of the 38 leased acres and assist plaintiffs with farming the rest, being

paid for his services. This arrangement was characterized as a partnership. The suggested language was incorporated into the sales contract, executed in April, 1983. The "partnership" agreement was not included in the contract, but Zarkoff farmed the eight-acre parcel and was paid for helping plaintiffs farm the remaining acres during the 1983 crop year.

The relationship between plaintiffs and defendants started off amicably but deteriorated. In August, 1985, Zarkoff told Mr. Rife about the sale and assignment and gave him a copy of defendants' contract with plaintiffs. Although he felt deceived, Mr. Rife was reluctant to terminate the lease immediately, because the semi-annual payment was due on September 1. He gave defendants notice of termination of the lease on December 5, three months after the payment was made. One week later, he executed a new lease with defendants for the same 38 acres. On January 22, 1986, defendants directed plaintiffs to vacate the leased property. Plaintiffs instituted this action to specifically enforce their contract with defendants.[1] The parties agreed to appoint a receiver to collect the proceeds from the sale of the farm crop, pending the outcome of the case.

The trial court determined that 1) Rifes' delay in cancelling the lease constituted a waiver of their right to cancel it; 2) defendants breached the contract with plaintiffs and came before the court with unclean hands; and 3) plaintiffs believed in good faith that the partnership arrangement with Zarkoff did not violate the anti-assignment clause and, therefore, they came before the court with clean hands. The court granted plaintiffs' request for specific performance under the renewal provisions of the lease and ordered the disbursement to plaintiffs of the funds held by the receiver.

■ On appeal, defendants make several arguments attacking the trial court's ordering specific performance. First, they contend that plaintiffs came before the court with unclean hands, because they knew about the non-assignment clause and nevertheless agreed to the assignment without first seeking the Rifes' consent.

The principles underlying the unclean hands maxim have been expressed this way:

---

[1] The Rifes were defendants at trial but are not parties to this appeal.

" '[T]he principle was established from the earliest days, that while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act *upon the conscience* of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies. This fundamental principle is expressed in the maxim, He who comes into a court of equity must come with clean hands * * *.' " *North Pacific Lumber Co. v. Oliver,* 286 Or 639, 650, 596 P2d 931 (1979), quoting 2 Pomeroy, *Equity Jurisprudence* § 398 at 93 (5th ed 1941). (Emphasis in original.)

Although we are not bound by the trial court's finding that plaintiffs acted in good faith, we accept it, given the judge's ability to see the witnesses and hear their testimony. We conclude that the trial court did not err in its determination that plaintiffs came to court with clean hands.

Next, defendants argue that Rifes did not waive their right to terminate the lease by reason of the breach of the non-assignment clause. The argument goes nowhere. The non-assignment clause was for the Rifes' sole benefit. They have not appealed from the trial court's determination of waiver. Defendants come to court asserting the rights of the Rifes against themselves for breach of a contract in order that they may avoid a contractual obligation to plaintiffs. The argument lacks both merit and logic.

Defendants next contend that, even if plaintiffs were allowed to enforce the lease provision of the contract, the lease expired in December, 1985, and plaintiffs have failed to exercise the option to renew. Defendants, however, exercised the renewal option. A comparison of the two leases executed between defendants and the Rifes convinces us that the second lease was intended to be a renewal of the first. Under

plaintiffs' and defendants' contract, plaintiffs are assignees of defendants' rights under the lease, and the exercise of the option by defendants inures to their benefit.

We decline to consider defendants' remaining assignment of error, because it was not preserved in the trial court.

Affirmed.